# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# OWENSBORO DIVISION

CIVIL ACTION NO. 4:16CV-00121-JHM

RICHARD ESCALERA                                                                    PLAINTIFF

VS.

BARD MEDICAL, A DIVISION OF C.R. BARD, INC.                                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendant, Bard Medical, A Division of C.R. Bard, Inc. ("Bard Medical"), for summary judgment pursuant to Fed. R. Civ. P. 56. [DN 57]. Defendant also requests an oral argument on this matter. Fully briefed, this matter is ripe for decision.

## I. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard the Court reviews the following facts.

## II. BACKGROUND

Plaintiff, Richard Escalera ("Escalera"), filed a race and national origin discrimination action pursuant to Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act against Bard Medical. Escalera was employed by Bard Medical from December 1, 2008 until November 2, 2015. Escalera is Hispanic, of Mexican descent, and dark-skinned. Bard Medical terminated Escalera on November 2, 2015, for alleged poor sales performance after issuance of a performance improvement plan ("PIP"). At the time of his termination, Escalera was employed as a Senior Specialist in the Interventional Urology Division ("IVU") and was the only member of the team who was not white.

Escalera began working for Bard Medical's Statlock Division in December 2008 as a territory manager. In January 2010, he was awarded "Rookie of the Year" for his 2009 performance. In 2010, Escalera was identified as a candidate for promotion to field sales trainer and finished 13th out of 49 territory managers in his division. His 2010 performance evaluation reflected that he exhibited a "strong desire to succeed and can be relied upon to get the job done no matter the situation." (DN 62, Exhibit 10.) In 2011, Escalera finished 10th in sales out of 49 territory managers. His 2011 performance review indicated that he had been "successful in

bringing new life in a territory that had not seen this activity in many years." (Smith Dep. Ex. 24.) In both his 2010 and 2011 performance evaluations, his manager rated him "Meets/Exceeds" expectations.

In December 2011, Bard Medical sold the Statlock Division, and Escalera accepted a job with the Interventional Urology Division ("IVU") of Bard Medical which required him to work a new territory and sell completely different products in 2012. The record reflects that Escalera's new territory had been vacant for six months and had "hemorrhaged" market share. (Smith Dep. Ex. 25; DN 63-6 at 14-15.) At the end of 2012, Brad Smith became Escalera's district manager. In the 2012 sales year, Escalera was ranked 24 out of 25 territory managers in his division and rated himself overall "Needs Improvement" on his 2012 Self-Assessment. While Escalera received an overall "Meets/Exceeds Expectations" in his performance evaluation, Smith identified several areas that "needs improvement" including the categories of Results Orientation, Innovation, Internal Collaboration, Perseverance, and Persuasiveness and Sales Ability. Additionally, Smith provided feedback regarding Escalera's performance noting that his "results in 2012 came up short" and the "strategy executed during that time frame did not yield results and this will have to change." (Escalera Dep. Ex. 27.)

Escalera testified that during his first meeting with Smith in 2013, Smith was combative with Escalera and attempted to convince Escalera to quit his position. In March of 2013, Smith sent a field visit letter to Escalera, copying Escalera's supervisors, reporting on Smith's visit with him and allegedly including inaccurate information that placed Escalera in a bad light. (Escalera Dep. Ex. 22.) Additionally, Escalera testified that while at a district sales meeting in Houston, Texas, Escalera asked Smith whether Smith lived in Houston. Smith responded that he did not because it was being taken over by Mexicans.

In October 2013, Smith prepared a personal review of his territory managers. Escalera maintains that despite having better numbers than a white territory manager Austin Ewing, who was rated by Smith as having "upside potential," and despite Escalera being ranked seventh overall in sales at that time, Smith rated Escalera as having "very limited potential upside." (DN 63-14 and DN 63-15, Escalera Dep. Exs. 15 and 16.) At the end of 2013, Escalera ranked fifth out of a total of 26 sales representatives and first in his district. In his performance review, Smith stated that Escalera had a "tremendous year in 2013, exceeding quota in stents and EndoBeam." Smith further stated that he did not "know if there is a person in the region that worked as hard as Richard did in 2013" and classified his overall performance rating as "Meet/Exceeds Expectations." (DN 59, Escalera Dep. Exhibit 28.)

In 2014, Escalera finished the year $112,804 below quota in stone disease and $70,100 below quota in the emphasis categories. (Escalera Dep. Ex. 29.) He ranked 11th out of a total of 23 sales representatives. Escalera's 2014 performance review assessed him overall "Meets/Exceeds Expectations" and stated that Escalera "works well with all members of the team." (Escalera Dep. Ex. 29). However, the performance review indicated that he needed improvement in two of his three "Annual Individual Goals" of Quota Performance and Territory Growth, as well as Innovation, Technical/Professional Competence, and Problem Solving. Smith provided the following feedback:

> Coming off of a Top Performance in 2013, Richard will be the first to tell you he is not happy with his results in 2014. Significant drops in stent/balloon business from his top 3 accounts hindered him from the start in 2015 [sic]. Richard was also set back with two stent losses but he refused to throw in the towel. Richard was able to maintain his laser fiber number coming within $7500 from quota in spite of the massive loss of business from the Lifeline Medical situation. Richard was able to put together several wins in the last half of the year which will propel him forward in 2015.

4

>Richard's sales funnel has the tendency to run thin at times. I believe this is the byproduct of the laser focus he puts on accounts to push them through to closure. The issue this causes is problems with his cadence as he has gone months between conversions. Richard is talented enough now to run multiple initiatives in different phases of the sales cycle and push them all forward so when one closes the next is in queue to close. I would like to see him close an account every 30 days as I believe he has the talent and market to allow this to happen.

(Id.) In the performance review, Smith also noted that "[d]emonstrating [his ability to navigate through and drive complicated sales processes] and delivering quota will be keys to Richard returning to the stage in 2015. I have full confidence in him and his ability to accomplish both of these." (Id.) In explaining his 2014 performance, Escalera represents that while he was 107% to quota in sales in the first quarter of the year, he began to lose significant business from his largest customer, Maury Regional Medical Center, as a result of issues it was having with Bard Medical's laser fibers.

Between October 2014 and January of 2015, Bard Medical released two new wires, the Solo Plus and Solo Flex, and a new basket, the Skylite basket, onto the market. However, due to production and design issues, the Solo Plus and Solo Flex wires were temporarily placed on a production hold in April 2015 and were not available to the territory managers to use or sale to their customers. At that time, Bard Medical made the decision to permit clients that were previously using the Skylite basket without incident prior to the production hold to continue to use and purchase the basket during the production hold. However, clients that were not existing users of the Skylite basket before the production hold or had had issues with the product were not permitted to use or purchase the Skylite basket during the production hold and were required to wait until a new model of the basket came out.

At the end of May 2015, Escalera was $124,446 below base in Core IVU and ranked 22nd out of 23 territory managers – ahead of a single territory manager who had been with the company for less than two months. (Escalera Dep. Ex. 35.) Escalera was also the subject of a customer complaint in March 2015 for improperly placing a Bard Medical product on a King's Daughters' Hospital operating room shelf in violation of the customer's acquisition procedures which resulted in the ban of Escalera from that operating room for six months.

In explaining his 2015 performance, Escalera contends that his sales performance was impacted significantly because Maury Regional Medical Center, Escalera's largest customer, decided to evaluate products produced by Bard Medical's competitor, Boston Scientific. Records reflect that the trial and the related loss of business was driven by either price or a supply chain agreement between Boston Scientific and Maury. (Smith Dep. Ex. 64, 68.) Escalera suggests that nothing in the record reflects that the loss of business was Escalera's fault. In early 2015, Escalera ranked seventh in the sale of one of Bard Medical's new products, the Skylite baskets. However, because of the product issues, two evaluations with Pikeville Medical Center and Owensboro Health did not occur in March of 2015 as planned. Instead, Pikeville Medical Center evaluated the products in July of 2015 and Owensboro Health did not evaluate the products at all. Additionally, Escalera represents that he lost significant business from Lifeline due to the failure of Bard Medical corporate and Lifeline to reach an agreement.

On May 21, 2015, Smith's boss, Sandy Thompson, the Director of Sales for the entire IVU Division, emailed Smith about Escalera noting that his numbers were significantly below quota for the quarter. Within three weeks of receiving Thompson's email, Smith drafted a performance improvement plan ("PIP") for review by Bard Medical's human resource department. On June 30, 2015, Bard Medical placed Escalera on the PIP. The PIP showed

Escalera below base through the end of May 2015 by approximately $79,000. (Escalera Dep. at Exs. 10, 15.) Escalera contends that the PIP is based on Escalera's 2015 performance alone; Bard Medical represents that the 2015 sales were just one factor in its issuance of a PIP.

The 60-day PIP required Escalera to achieve three sales-focused requirements: (1) achieve 100% year to date territory base IVU sales within 60 days; (2) "within 30 days you will have" completed a successful CORE IVU paid evaluation with all clinicians and material managers for a conversion of at least $85,000 in business; and (3) have no further losses to core business. (Smith Dep. Ex. 70.) The PIP indicated that Escalera's failure to demonstrate significant improvement could lead to immediate termination of his employment. The PIP was signed by Brad Smith and copies sent to Vice President of Sales Rob Hanson, Director of IVU Sales Sandy Thompson, and Human Resource Senior Manager Cindy Wilder. (Id.) From January through August 2015, the results reflected that Escalera was still at the bottom of the rankings with a total average loss in Core IVU sales of $156,766. (Ottley Dep. Ex. E at 46-47.)

On September 16, 2015, Bard Medical placed Escalera on a PIP extension requiring him to achieve 100% year to date quota in territory core IVU sales within the next 30 days or risk being immediately terminated. Escalera testified that at the PIP extension meeting, Smith told Escalera to look for a new job. (See Smith Dep. Ex. 76.) At his deposition, Escalera acknowledged that he could not attain the result requested and communicated to Smith that he would start looking for another job. (Escalera Dep. at 228-229.)

Bard Medical terminated Escalera on November 2, 2015, for poor sales performance. During the period beginning January 1, 2010 and ending December 31, 2015, Escalera was the only Hispanic/Latino employee to work in the IVU Division. Within a few months, Bard Medical replaced Escalera with Jason Miller, a white employee.

Escalera claims that he was terminated due to discrimination on the basis of race and national origin. Specifically, Escalera alleges that he was replaced by a white male and that Bard Medical treated him differently from similarly situated white employees because of his national origin and race. Furthermore, Plaintiff contends that Defendant used Escalera's PIP performance as a pretext for firing him when the decisionmakers knew that his sales numbers were a direct result of the company's withdrawn products and medical devices. Bard Medical now moves for summary judgment on all of Escalera's claims.

**DISCUSSION**

Bard Medical argues that summary judgment on Escalera's claim of race discrimination under Title VII, 42 U.S.C. § 2000e–2(a)(1), and the Kentucky Civil Rights Act ("KCRA"), KRS § 344.010, should be granted because Escalera failed to state a *prima facie* case and failed to show that the legitimate, nondiscriminatory reason for his termination was a pretext for unlawful discrimination. Courts interpret Title VII and the KCRA using the same standards. Smith v. Leggett Wire Co., 220 F.3d 752, 758 (6th Cir. 2000) ( "Because Ky. Rev. St. Chapter 344 mirrors Title VII of the Civil Rights Act of 1964 ("Title VII"), we use the federal standards for evaluating race discrimination claims.").

**A.** ***Prima Facie*** **Case**

Bard Medical first argues that Escalera failed to make out a *prima facie* case of discrimination under Title VII. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Where, as here, a plaintiff offers only indirect evidence of discrimination, he may establish a *prima facie* case under Title VII by

showing: "1) he is a member of a protected class; 2) was qualified for the job; 3) he suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." Newman v. Federal Express Corp., 266 F.3d 401, 406 (6th Cir. 2001).

If a plaintiff satisfies this requirement, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 410–11 (6th Cir. 2008); Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 703 (6th Cir. 2008). If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the proffered reason is pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). This means that in order to withstand a motion for summary judgment, a plaintiff must show that there is a triable issue of fact upon which a jury could reasonably find that more likely than not the employer's reason is a pretext for unlawful discrimination. Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir.1994).

For purposes of this motion, Bard Medical essentially concedes that Escalera is qualified for his job, that termination is an adverse employment action, and that Escalera was replaced by a white individual. However, Bard Medical argues that Escalera cannot prove the first element of his *prima facie* case – that he is a member of a protected group. Bard Medical maintains that Escalera testified that he considered himself to be white and that he identifies himself as such on government documents. (Escalera Dep. at 28-29.) Additionally, Bard Medical asserts that Escalera's sole claim in his EEOC charge is that between June 30 and November 2, 2015, he was discriminated against based on his race. As such, Bard Medical argues that he cannot now

proceed on any other basis, including national origin or color discrimination. Ang v. Procter & Gamble Co., 932 F.2d 540, 546 (6th Cir. 1991), overruled on other grounds, Arbaugh v. Y & H Corp., 546 U.S. 500 (2006). Bard Medical contends that Escalera could not be discriminated against based on his "Mexican descent" because "Mexican" is not a race. Finally, Bard Medical maintains that to the extent Escalera intends to salvage his claims by relying on his Mexican national origin or his skin color, such attempt fails because he did not exhaust his administrative remedies by filing such charges with the EEOC.

First, despite Bard Medical's argument to the contrary, Escalera is a member of a protected class, being Hispanic, Mexican-American, and dark-skinned. Bard Medical misrepresents Escalera's testimony regarding whether he considered himself white. Escalera testified that he considered his race as Mexican-American, and he identifies his race as "Hispanic" on government documents. (Escalera Dep. 27-28.) However, Escalera explained that during the period of time before government forms included Hispanic as a choice for race or ethnicity, Escalera had to choose white because the form only provided choices of white, Native American, or African American. (Id.)

Second, the Court rejects Bard Medical's argument that Escalera cannot assert a claim in this lawsuit based on national origin or color discrimination because Escalera only asserted in his EEOC charge that Bard Medical discriminated against him based on his race. Prior to seeking relief in federal court on a claim of employment discrimination, a Title VII claimant "must explicitly file the claim in an EEOC charge or the claim must be 'reasonably expected to grow out of the EEOC charge.'" Burus v. Wellpoint Companies, Inc., 2010 WL 1253089, *3 (E.D. Ky. Mar. 25, 2010). See also Bardwell v. Aerotek, Inc., 2018 WL 2470995, at *2 (W.D. Ky. June 1, 2018)(citing Dixon v. Ashcroft, 392 F.3d 212, 217 (6th Cir. 2004)). Where facts with

respect to the charged claim would prompt the EEOC to investigate a different uncharged claim, a plaintiff is not precluded from bringing a suit on that claim. Davis v. Sodexho, 157 F.3d 460, 463 (6th Cir. 1998); Alazawi v. Swift Transp. Co., Inc., 391 F. Supp. 2d 626, 631 (W.D. Tenn. 2004).

The EEOC's file related to Escalera's charge includes Escalera's Intake Questionnaire in which he identifies himself as Hispanic or Latino. The questionnaire asks his race, but no option exists for Hispanic, Latino, or Mexican. Escalera then identifies his "National Origin" as "American/Mexican." In Section 4 of the questionnaire, when asked the reason for discrimination, the boxes for "Race," "Sex," and "Retaliation" are checked. In Section 8, he identifies a "White/Male/American" as the person in the same or similar situation treated better than him. The EEOC investigator in his October 26, 2015 memorandum does not mention race, color, or national origin – only that Escalera claimed he was "being unfairly evaluated compared to Eric Kanzinger [sic], a white employee."

Although Escalera did not check the national origin or color box in his Charge of Discrimination with the EEOC, the Sixth Circuit applies the "expected scope of investigation test," which analyzes whether "facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim." Weigal v. Baptist Hosp. of East Tennessee, 302 F.3d 367, 380 (6th Cir. 2002). If so, "the plaintiff is not precluded from bringing suit on that claim." Id. In the present case, the Court finds that the EEOC charge coupled with the intake questionnaire implicitly alleged national origin and color discrimination, without marking the box for those alleged discriminatory practices, and was sufficient to "reasonably be expected to lead the EEOC to investigate" Escalera's claim of discrimination based on national origin or color. Id. Escalera's charge of discrimination put the EEOC on notice to investigate the charges

of race, national origin, and color discrimination and put Bard Medical on notice that Escalera had complaints against it for these related claims. See Crouch v. Rifle Coal Co., LLC, 2009 WL 3806404, at *3 (E.D. Ky. Nov. 13, 2009), clarified on denial of reconsideration, 2009 WL 4015927 (E.D. Ky. Nov. 19, 2009); Magana v. Tarrant/Dallas Printing, 193 F.3d 517 (5th Cir. 1999)(claim in EEOC charge that claimant was demoted because of his national origin, i.e., Mexican-American, read to embody a claim of discrimination based on race as well as national origin).

Bard Medical's comparison of the facts of this case to those of Ang v. Procter & Gamble Co., 932 F.2d 540, 546 (6th Cir. 1991), is inaccurate. Unlike Ang, Escalera provided information relating to national origin to the EEOC during the interview and was not assisted by counsel in preparing the EEOC charge. The Sixth Circuit in Ang specifically held:

> Because Ang's Asian race and Indonesian ancestry are closely related and may have both contributed to any discrimination he suffered, the district court could have concluded that an investigation could reasonably include discrimination based on race and national origin. The court, however, did not clearly err in concluding that Ang's failure to raise race discrimination in his EEOC charge was a fatal flaw as Ang was assisted by counsel in writing his charge, his charge did not specifically allege race discrimination, and the EEOC did not investigate race discrimination.

Ang, 932 F.2d at 546. "Charges of discrimination are frequently filed by lay people, and courts recognize that subsequent actions should not be restricted by the failure of non-lawyers to attach the correct legal conclusion to the EEOC claim, conform to procedural technicalities, or include 'the exact wording which might be required in a judicial pleading.'" Daily v. American Founders Bank, Inc., 667 F. Supp. 2d 728, 733 (E.D. Ky. 2009)(quoting Davis, 157 F.3d at 463).

Accordingly, Escalera provided sufficient evidence to establish his *prima facie* case of discrimination based on race, national origin, or color.

12

**B. Legitimate, Non–Discriminatory Reason**

Bard Medical has offered a legitimate reason for the termination of Escalera's employment. Bard Medical represents that it made a legitimate business decision to terminate Escalera's employment as a medical device salesperson after he failed to meet his quota three out of the four years that he was in the UVI division, lost $156,766 in base sales in eight months in 2015, consistently ranked in last place in both his district and the entire division throughout 2015, and was the subject of numerous customer complaints. In fact, Bard Medical represents that Escalera's reported loss in sales was the highest of any UVI team manager by more than $55,000. Accordingly, Bard Medical offered a legitimate, non-discriminatory explanation for its termination of Escalera, thus destroying "'the legally mandatory inference of discrimination arising from the plaintiff's initial evidence.'" Manzer, 29 F.3d at 1082 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 n. 10 (1981)).

**C. Pretext**

Escalera contends that Bard Medical's legitimate, non-discriminatory reason for his termination is pretextual. In order to establish pretext, a plaintiff must show that the proffered reason (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate that action. Manzer, 29 F.3d at 1084. Ultimately, to carry his burden in opposing summary judgment, Escalera must produce sufficient evidence from which a jury could reasonably reject Bard Medical's explanation of why they terminated him. Chen v. Dow Chemical Co., 580 F.3d 394, 400 (6th Cir. 2009). Escalera raises three arguments for the proposition that Bard Medical's proffered reasons were actually a pretext for discrimination.

**1. Similarly Situated Employees**

Escalera first argues that other white team managers who experienced comparable losses

were treated better than he because they were not placed on a PIP or terminated.[1] "Although a plaintiff can prove pretext in several ways, evidence '[e]specially relevant to such a showing' is proof that an employer treated similarly situated Caucasian employees differently when they engaged in acts of comparable seriousness." Tenial v. United Parcel Service, Inc., 840 F.3d 292, 303 (6th Cir. 2016) (citing McDonnell Douglas, 411 U.S. at 804.).

"Employees are similarly situated when they are similar 'in all relevant respects.'" Guyton v. Exact Software North America, 2016 WL 3927349, at *10 (S.D. Ohio July 21, 2016)(quoting Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 753 (6th Cir. 2012). "This standard does not require 'exact correlation.'" Id. "Indeed, the Sixth Circuit has clarified on more than one occasion that individuals need not have the same supervisor to be similarly situated." Guyton, 2016 WL 3927349, *10 (citing Louzon v. Ford Motor Co., 718 F.3d 556, 564 (6th Cir. 2013); Bobo, 665 F.3d at 751; Seay v. Tennessee Valley Auth., 339 F.3d 454, 479-80 (6th Cir. 2003) (noting that "the 'same supervisor' criterium" is not an "inflexible requirement"). "And such a requirement would be illogical because it would essentially obviate the possibility of employer liability in a small department in which a plaintiff's 'job responsibilities are unique to his or her position' or only one or a few employees share a common supervisor." Guyton, 2016 WL 3927349, *10 (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998)); see also Louzon, 718 F.3d at 564 (holding that a same-supervisor requirement would "render any plaintiff's burden virtually impossible" against the defendant because each supervisor managed "no more than a few individuals"); Arnold v. City of Columbus, 515 Fed.

---

[1] Escalera argues that Bard Medical impermissibly relies on his performance for periods other than 2015 even though the relevant documents and testimony make clear that Escalera was put on a PIP and terminated solely for his 2015 performance. (Escalera Dep. at 80.) Further, Escalera argues that Bard Medical fails to present Escalera's pre-2015 performance in a fair light given the applicable summary judgment standard. In determining whether other employees are similarly situated, it is entirely appropriate to consider "[d]ifferences in job title, responsibilities, experience, and work record." Leadbetter v. Gilley, 385 F.3d 683, 691 (6th Cir. 2004). See Campbell v. Hamilton County, 23 Fed. Appx. 318, 325 (6th Cir. 2001) (holding that differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated).

Appx. 524, 532 (6th Cir. 2013). Instead, "in determining whether two employees are similarly situated 'in all relevant respects,' the Court's task is to 'make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.'" Guyton, 2016 WL 3927349, *10 (quoting Louzon, 718 F.3d at 563-64).

Escalera maintains that numerous white team managers from the IVU Division had sales below base for extended periods in 2015 and were well below quota for the year, but none of them were placed on a PIP or otherwise disciplined or terminated. Escalera puts forth four potential comparators that he asserts had similar base losses in core endourology: Eric Kunzinger, Dan Santoro, Trevor Peters, and Eric Martin.[2] Escalera acknowledges that for six months between January 1 to June 30, 2015 he was $124,425.95 below base in core endourology and placed on a PIP. Escalera represents that from April 1 to September 30, 2015, Eric Kunzinger was $151,851.89 below base; from August 1 to December 31, 2015, Dan Santoro was $126,557.17 below base; from June 1, 2015 to December 31, 2015, Trevor Peters was $122,866.29 below base; and from July 1 to December 31, 2015, Eric Martin was $199,904.97 below base. (Plaintiff's Response at ¶ 28.) McGregor Ottley, Bard Medical corporate representative, also confirmed that these team managers from the IVU Division were not placed on a PIP in 2015, notwithstanding the fact their sales were below base sales at various times during the year. (Ottley Dep. 37, 50, 60, 64, 65.) Ottley testified that both Kunzinger and Santoro were promoted in 2015.

Escalera contends that despite deficiencies in these team managers' sales performances, Bard Medical attributed their losses to Solo/Skylite production problems. For example, Ottley

---

[2] Bard Medical argues that these four team managers are not similarly situated to Escalera because they were supervised by different district managers. The record reflects that in 2015 there were only 23 team managers and each district manager supervised approximately four individuals. Based on the case law discussed above and for purposes of this motion, the Court will treat these four team managers as comparators despite the fact that they were not supervised by Smith.

testified that Santoro's 2015 performance review indicated that the "Solo wire and Skylite basket sales halt limited his ability [to] fend off" competitors in his base accounts. (Ottley Dep. at 61, Ex. 15.) Similarly, Kunzinger's 2015 performance review noted that his numbers "certainly were not a reflection of his activities, efforts and/or strategies, and were more clearly a function of the negative impact associated with the performance and ultimately supply issues with SOLO and SKYLITE." (Ottley Dep Ex. 2.) Peters' 2015 performance review states that he "like many in the sales force, was swept into the malaise of the Solo/Skylite sales halt early in 2015." (Ottley Dep. Ex. 13.) Ottley testified that this was a "time frame where [the TMs] weren't able to sell certain products" and that it "did have an impact on the sales force during that time frame." (Ottley Dep. at 53.)

However, a review of the "over base level" numbers of the four comparators and Escalera in core endourology reflects significant differences in the severity of losses between the comparators and Escalera during the January through June 2015 time period. Escalera's utilization of different time periods for each comparator within 2015 is not appropriate when examining the team managers' performances given Bard Medical's Solo/Skylite production products. Using the same time frame for each comparator, the record reflects that between January through June of 2015, Kunzinger was $55,626.89 below base, Santoro was $160,651.77 *above* base, Peters was $20,070.56 *above* base, and Martin was $79,932.38 *above* base. (Ottley Dep. Exs. 3, 12, 14, 16.) These numbers demonstrate that the "losses" experienced by the comparators during the same time period as Escalera are not substantially identical. Escalera's loss of base was $68,799.06 more than the closest comparator he identified.

Additionally, comparing the "over base level" numbers of the comparators and Escalera between January through October 2015 reflects that at the time Escalera was terminated he had

16

suffered significantly more loss over base than his identified comparators: Escalera was $174,792.44 below base, Kunzinger was $101,132.60 below base,[3] Santoro was $110,078.73 *above* base, Peters was $31,876.80 below base, and Martin was $1,611.79 below base. Because of these significant differences in losses, no reasonable jury could find that these four comparators and Escalera are similarly situated in all relevant respects.

The record further reflects that both Trevor Peters and Eric Martin began to experience monthly losses toward the end of 2015. Ottley testified that given their end of the year sales performances, both Peters and Martin were warned by their district managers that they would be placed on a PIP if their sales numbers did not improve in 2016. (Ottley Dep. at 83.) Both Peters and Martin resigned in 2016 prior to be placed on a PIP. Just as with Escalera, these team members' sales performances were identified by management as "needs improvement" and were counseled that if their numbers did not improve a performance improvement plan would be implemented. The differences in these team managers and Escalera are the timing of their losses in 2015 and the fact that these employees resigned in 2016 before being placed on a PIP.

Finally, Escalera complains that despite Kunzinger's poor sales performance for 2015, he was promoted to district manager, while Escalera was terminated. The Court previously determined that Kunzinger is not a proper comparator based on his 2015 performance record. Notwithstanding, when examining Bard Medical's promotion of Kunzinger, the Court must examine Kunzinger's work and performance history with the company. Ottley testified that Kunzinger was promoted based on the entirety of his career with Bard, notwithstanding his 2015 performance. (Id. at 40.) As the record reflects, during Kunzinger's six years as a territory manager, Kunzinger achieved net aggregate sales exceeding quota of approximately $1,000,000. He finished first, third, and fifth in sales in 2012, 2013, and 2014 respectively and won 2012

---

[3] Kunzinger assumed his new job as district manager at the end of August 2015.

Territory Manager of the Year, joined Bard Leadership Development Program as a National Field Sales Trainer, and became a President's Club Award Winner. Kunzinger's performance history with Bard Medical is not comparable to that of Escalera for purposes of promotion to district manager.

For these reasons, the Court finds that the four comparators and Escalera, as evidenced by their respective performances, can be differentiated clearly. Consequently, these team managers are not similarly-situated to Escalera.

### 2. Bard Medical Aware that Majority of Losses Beyond Escalera's control.

Escalera argues that even assuming that a review of Escalera's 2015 sales numbers were a reason to discipline him, Bard Medical was well aware that a super-majority of Escalera's sales losses in 2015 were beyond his control. Escalera maintains that the documents produced by Bard Medical show that he was approximately $124,000 below base at the time he was put on his PIP. Of that amount, Escalera claims $36,000 is attributable to a loss of business with Lifeline as a "result of Lifeline's business model." (Response at 28.) Escalera maintains that approximately $58,500 was a result of Escalera's largest customer, Maury, switching to a competitor based on price or a supply chain agreement. Escalera maintains that, at most, he was responsible for a loss of base of only $30,000. Escalera argues that because Bard Medical knew that issues with the new products precluded sales of other products that would permit Escalera to regain his loss of base, Bard Medical's discipline of Escalera, including termination, was not reasonably informed or considered.

Escalera cannot avoid summary judgment merely by disagreeing with Bard Medical's business decision to terminate him for poor performance. See Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 285–86 (6th Cir. 2012) (the pertinent issue is whether the employer made an

honest, informed business judgment, not whether that business judgment was correct or ideal); Stein v. National City Bank, 942 F.2d 1062, 1065 (6th Cir. 1991) ("It is not the function of courts to judge the wisdom of particular business policies . . ."); Hartsel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996) ("the law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with"; rather, it forbids them only from making decisions "for impermissible, discriminatory reasons"); Adams v. Tennessee Dept. of Finance & Admin., 179 Fed. Appx. 266, 272 (6th Cir. 2006) ("Courts are not intended to act as super personnel departments to second guess an employer's facially legitimate business decisions."). "A plaintiff 'must provide evidence not that [the defendant-employer] could have made a business decision that others might think more fair, but that [the defendant-employer] made the decision to terminate him because of his membership in a protected class.'" Lawroski v. Nationwide Mut. Ins. Co., 981 F. Supp. 2d 704, 714 (S.D. Ohio 2013), aff'd in part, 570 Fed. Appx. 589 (6th Cir. 2014) (quoting Norbuta v. Loctite Corp., 1 Fed. Appx. 305, 314–15 (6th Cir. 2001). Simply because Plaintiff suffered losses in sales as a result Solo/Skylite production problems or a client's decision to try a competitor's product does nothing to cast doubt on Smith or Thompson's impression of Escalera's work during the time in question.

### 3. Smith's Alleged Statement

To establish pretext by arguing that the proffered explanation did not actually motivate the discriminatory action, a plaintiff can "attack [ ] the employer's explanation by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." Smith v. Leggett Wire Co., 220 F.3d 752, 759 (6th Cir. 2000) (quoting

Manzer, 29 F.3d at 1084) (internal quotation marks omitted); Reed v. American Cellular, Inc., 39 F. Supp. 3d 951, 967 (M.D. Tenn. 2014). "In determining the relevance of discriminatory remarks presented as circumstantial evidence, this Court looks to the identity of the speaker, whether the remarks are isolated or ambiguous, and the temporal proximity of the remarks to the adverse action." Reed, 39 F. Supp. 3d at 967.

To the extent that Escalera argues that Smith's alleged statement that Smith did not live in Houston because it was "being taken over by Mexicans" is evidence that Bard Medical's proffered reason for termination is a pretext for discrimination, the Court finds that the isolated statement is not evidence of discrimination. Even assuming that Smith made the statement, the statement was isolated and was allegedly made in 2015 – two years prior to the adverse action. This statement alone does not establish a pretext for Escalera's termination.

For these reasons, even when making all justifiable inferences in favor of Escalera, the Court concludes that Escalera has not shown Bard Medical's proffered reason for his termination was pretext for discrimination. Accordingly, Bard Medical is entitled to summary judgment as to these claims.

## IV. CONCLUSION

For these reasons, **IT IS HEREBY ORDERED** that motion by Defendant, Bard Medical, A Division of C.R. Bard, Inc. ("Bard Medical"), for summary judgment pursuant to Fed. R. Civ. P. 56 [DN 57] is **GRANTED**. A judgment will be entered consistent with this opinion. The Court finds that no oral argument is necessary in this matter.

cc: counsel of record

*Joseph H. McKinley*

Joseph H. McKinley Jr., District Judge
United States District Court

March 14, 2019